**JACOB COOPER**                                                                 **PLAINTIFF**

**VS.**                                            **CAUSE NO. 3:14-CV-91-MPM-SAA**

**LYNN BROWN AND**
**CITY OF HORN LAKE, MISSISSIPPI**                                    **DEFENDANTS**


## ORDER

This cause comes before the court on the motion of plaintiff Jacob Cooper for partial

summary judgment, as to the issue of liability, with regard to his Fourth Amendment claims

against defendant Lynn Brown, a Horn Lake police officer. Brown and his employer, the City of

Horn Lake, have responded with their own motions for summary judgment. This court, having

considered the memoranda and submissions of the parties, concludes that plaintiff's motion for

partial summary judgment should be granted, that Brown's motion for summary judgment on the

basis of qualified immunity should be denied, and that Horn Lake's motion for summary

judgment should be granted.

This is a Fourth Amendment excessive force case filed by plaintiff Jacob Cooper arising

out of an incident in which he was attacked and injured by a police dog. At approximately 11

p.m. on April 21, 2013, plaintiff fled from the scene after he was stopped by Horn Lake police

officer Michael Pressgrove for suspicion of DUI. Plaintiff fled on foot, leaving his vehicle

behind, and he hid near a garbage bin in an alleyway. Several Horn Lake officers responded to

Officer Pressgrove's call for assistance, among them Horn Lake K9 officer Lynn Brown and his

dog, a Belgian Malinois named Sunny.

Sunny discovered plaintiff in his hiding place, and the parties disagree about whether she initiated the attack on plaintiff herself, as Brown contends, or whether she was ordered to attack, as plaintiff contends. The parties do agree, however, that city policy required that a suspect be given a verbal warning prior to being attacked by a police dog and that no such warning was given in this case. Moreover, Brown does not contend that he made any efforts to stop Sunny's attack on plaintiff after (under his version of events) she initiated it, until such time as he managed to handcuff plaintiff. Both plaintiff and Officer Brown testified that it may have taken between a minute and two minutes for Brown to handcuff plaintiff, during which time Sunny continued her attack on plaintiff's leg. Plaintiff suffered serious lower leg injuries as a result of Sunny's attack, and he has filed the instant § 1983 action against Brown and the City, alleging that the use of force against him was objectively unreasonable under applicable Fourth Amendment standards.

## ANALYSIS

The court first considers Brown's motion for summary judgment, based on qualified immunity, in which he seeks the dismissal of the excessive force claims against him. To establish a Fourth Amendment violation based on allegations of excessive force, a plaintiff must prove: (1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable. *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012). In *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865 (1989), the U.S. Supreme Court stated that the relevant factors for consideration on an excessive force claim include, "the severity of the crime at issue, whether the suspect poses an immediate threat

to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight."

In considering the excessive force claims asserted against Officer Brown in his individual capacity, this court applies the Fifth Circuit's qualified immunity standard, which it has described as follows:

> This court applies a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. First, we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights." If the evidence viewed in the light most favorable to Appellees demonstrates that a constitutional violation occurred, "we next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.

*Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir. 2007).

Part of the power of the qualified immunity doctrine arises from the fact that it must simply be raised as a defense by a defendant, and the plaintiff has the burden of establishing the proof and arguments necessary to overcome it. *See Pierce v. Smith*, 117 F.3d 866, 871–72 (5th Cir. 1997) (noting that the plaintiff bears the burden of demonstrating that an individual defendant is *not* entitled to qualified immunity). Once again, plaintiff's burden in this regard includes an obligation to demonstrate that the defendants violated "clearly established law" at the time of the conduct in question. The U.S. Supreme Court has made it clear just how heavy a burden this may be.

In *Plumhoff v. Rickard,* 134 S. Ct. 2012 (2014), the Supreme Court recently emphasized that:

> An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was " 'clearly

established' " at the time of the challenged conduct. *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011). And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Id.*, at 2083–2084. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." *Ibid.* In addition, "[w]e have repeatedly told courts ... not to define clearly established law at a high level of generality," *id.*, at 2074, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

*Plumhoff,* 134 S. Ct. at 2023. Thus, the U.S. Supreme Court has stressed that plaintiffs' burden of demonstrating that defendants violated "clearly established law" requires not a citation to generalized principles of law, but, rather, specific authority on point which "placed the statutory or constitutional question" confronted by the official "beyond debate." *Id.* Moreover, the Supreme Court has very recently indicated that, to establish that the law in this regard was "clearly established," the plaintiff must be able to cite either a decision from that Court or a "robust consensus of cases of persuasive authority in the Courts of Appeals." *Taylor v. Barkes*, 135 S. Ct. 2042 (2015), *citing City and County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1778 (2015).

Plaintiff has, in fact, produced some federal appellate precedent in support of his excessive force claim. For example, plaintiff cites *Vathekan v. Prince George's County*, 154 F.3d 173, 179 (4th Cir. 1998), in which the Fourth Circuit held that a "failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context." Plaintiff also relies upon district court opinions from this circuit which reached a similar conclusion. *See Stranjac v. Jenkins*, 2012 WL 3862377 at *11 (M.D. La. 2012)("Even in the absence of Fifth Circuit caselaw specifically addressing excessive force allegations in a dog bite case, no

reasonable police officer could conclude that the use of a police dog is permissible when employed, without warning, against a secured non-threatening suspect."); *Malone v. City of Fort Worth, Tex.*, 2014 WL 5781001, *15 (N.D. Tex. 2014)(officer's failure to warn suspect before releasing dog and before lifting dog up where it could bite suspect precludes summary judgment for officer on basis of qualified immunity).

While this court finds these opinions persuasive, it will assume that plaintiff has fallen short of producing the "robust consensus" of federal appellate authority which is apparently now required by the U.S. Supreme Court in most cases. It is thus significant that the U.S. Supreme Court has held that there are exceptional cases in which a failure to meet this extraordinarily stringent requirement of precedent may be excused. In *Hope v. Pelzer,* 536 U.S. 730 (2002), the Supreme Court considered an Eighth Amendment claim in a case where prison guards handcuffed a prisoner to a hitching post on two occasions, one of which lasted for seven hours without regular water or bathroom breaks. Among other facts, the Supreme Court noted that "[a]t one point, a guard taunted him about his thirst." *Hope,* 536 U.S. at 738. Faced with these facts, six Supreme Court Justices concluded that the Eleventh Circuit erred in concluding that the defense of qualified immunity was available to the defendants. In so concluding, the Court observed that "[a]s the facts are alleged by Hope, the Eighth Amendment violations [are] obvious." *Id.* The Supreme Court reached this conclusion in spite of the fact that the plaintiff was unable to demonstrate federal appellate authority clearly establishing that it was unlawful to tie a prisoner to a hitching post.

In subsequent decisions, the Supreme Court has explained *Hope* as standing for the proposition that a failure to cite federal appellate authority supporting a claim may be excused in

cases where the constitutional violation is "obvious." In the 2004 decision of *Brosseau v. Haugen,* for example, the Supreme Court wrote that:

> Of course, in an obvious case, these standards can "clearly establish" the answer, even without a body of relevant case law. *See Hope v. Pelzer*, 536 U.S. 730, 738, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (noting in a case where the Eighth Amendment violation was "obvious" that there need not be a materially similar case for the right to be clearly established).

*Brosseau v. Haugen,* 543 U.S. 194, 199 (2004).

The *Hope* exception is not frequently applied; indeed this court can not recall having done so in a prior case. Nevertheless, the court considers it to be a highly important exception to the exceedingly stringent showing of prior precedent which applies in most qualified immunity cases. Indeed, if this exception did not exist, then defendants might feel at liberty to engage in a wide variety of obviously unconstitutional conduct which had not yet been declared unlawful by a "robust consensus" of federal appellate authority. It also seems clear that there must be some mechanism for plaintiffs to "break through" the general requirement of prior precedent, lest the law end up essentially frozen in place, with little potential for development based on novel fact patterns or evolving law enforcement practices.

This court notes that, while the district court in *Stranjac* did not explicitly rely upon *Hope*, its previously-quoted conclusion that "[e]ven in the absence of Fifth Circuit caselaw specifically addressing excessive force allegations in a dog bite case, no reasonable police officer could conclude that the use of a police dog is permissible when employed, without warning, against a secured non-threatening suspect" unmistakably utilizes *Hope*'s rationale. This highlights the fact that *Hope*'s analysis is largely a matter of common sense which flows naturally from general qualified immunity principles. Indeed, this court believes that any jurist

would be hard-pressed to defend the contrary position, namely that obvious constitutional violations *should* be excused merely because federal appellate courts had not issued opinions unanimously concluding that the conduct in question was unlawful. This may be why the Supreme Court stated in *Brosseau* that "[o]f course" a "body of relevant case law" is not required in "obvious cases," as if the matter were largely self-evident. *Brosseau,* 543 U.S. at 199.

This court believes that *Hope*'s logic is, in fact, self-evident, and it will apply that logic in this case. Once again, it is incumbent upon plaintiff, under *Hope*, to demonstrate not only that Officer Brown's actions were unreasonable under Fourth Amendment standards, but that they were "obviously" unreasonable. Clearly, *Hope*'s requirement that plaintiff demonstrate that Officer Brown's actions were "obviously" unreasonable subsumes the Fourth Amendment's mere "reasonableness" standard, and this court will therefore limit its discussion to *Hope*'s more exacting standard. As discussed below, the court finds this to be one of the rare cases where the plaintiff is able to demonstrate an "obvious" constitutional violation under *Hope*.

Prior to considering the facts of this case, this court notes that the Supreme Court has recently emphasized that district courts are required to "draw[] inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong" of the qualified immunity standard. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014). *Tolan* is significant in that it reminds district courts that, while the playing field is heavily tilted towards the defendant in many aspects of the qualified immunity analysis, the customary requirement that summary judgment facts be construed in favor of the non-moving party still applies in this context. Based upon these considerations, this court now turns to the reasonableness of Officer Brown's actions in this case.

7

In determining whether Officer Brown's actions in this case were "obviously" unreasonable, this court's views are significantly influenced by photographs depicting the results of the dog attack on plaintiff's leg. [Exhibit 8, plaintiff's motion for summary judgment]. First of all, "pictures don't lie," and the photos do tend to corroborate plaintiff's depiction of a sustained and brutal dog attack upon him. Indeed, in his deposition, Officer Brown himself acknowledged that plaintiff's injuries were more severe than those which are typically seen in cases where police dogs are employed against suspects:

> Q: At what - now, hopefully, we'll be able to agree to this. Jacob Cooper's injuries as a result of Sunny's bite were severe?
> A: Yes.
> Q: And certainly not typical.
> A: No, not typical of most of the dog bites we see. No, they're not.

[Dep. at 57]. It strikes this court that the severity of plaintiff's injuries should come as no surprise to Officer Brown, since they occurred mere inches from him, as he was handcuffing plaintiff. It further seems "obvious" that it was unreasonable for Brown to simply stand by and allow such injuries to continue to be inflicted upon a non-violent suspect who was no longer actively trying to escape or otherwise resist arrest.

In excessive force cases, the Fourth Amendment reasonableness analysis involves balancing the nature of the harm inflicted upon a suspect with the law enforcement necessity, if any, for inflicting that harm. *See Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008). Given that Officer Brown himself acknowledges that plaintiff's injuries were more severe than in most cases where dogs are employed, it should be apparent that the reasonableness analysis employed in more typical dog attack cases is of less relevance here. Defendants cite favorable case law regarding the use of tasers, but it should be apparent that, barring malfunction, the amount of

force resulting from the use of a taser is much more predictable than the amount of force used when a dog attacks a suspect. Simply stated, some dogs are much more aggressive than others, and some dog attacks are much more brutal than others. In cases where the injuries inflicted on a suspect are more severe, a greater showing of necessity is required in order for them to be considered reasonable.

That brings this court to the necessity of using a police dog to physically subdue (as opposed to merely locate) plaintiff in the first place. Plaintiff argues that a reasonable officer in Brown's position should have known that, even in the event that he somehow managed to temporarily evade the dragnet looking for him, the chances that he would manage to escape justice were quite low. Plaintiff notes that Brown was aware that law enforcement had both the vehicle he was driving and his passenger in custody, and that while it later became known that he had given Officer Pressgrove a false name, that was unknown at the time. In his deposition, Brown conceded that, at the time he decided to deploy Sunny he knew that the suspect was not charged with a violent offense or even a felony:

> Q: But at this point you had no reason to believe - and when I say at this point, at the point you made the decision.
> A: No.
> Q: - to deploy K9 Sunny, you had no reason to believe he had done anything other than misdemeanor DUI.
> A: Correct.
> Q: And you also had no reason to believe that he had given improper identification prior to your decision?
> A: At that point, no I did not.
> Q: Okay. And Officer Pressgrove never gave you any reason to believe in calling you that Jacob Cooper had been a physical threat in any way.
> A: No.

[Dep. at 57].

9

While reasonable minds may disagree whether the basic decision to deploy a K9 unit to search for plaintiff was necessary, this court does not believe that it was unreasonable, within the meaning of the Fourth Amendment, to do so. In the court's view, the Fourth Amendment violation in this case took place not as a result of the basic decision to deploy a K9 unit to *search* for plaintiff, but, rather, as a result of the manner in which a dog attack was used to subdue plaintiff, once his location was discovered.

In his deposition, Officer Brown made it clear that plaintiff was not running away when he was discovered, but that he was merely sitting in an alleyway. Brown also conceded that he was aware that there were a number of other officers on the scene searching for plaintiff and that some of them had passed by the location where he was hiding. Given these facts, it strikes this court that once plaintiff's location was discovered, the chances that he might be able to take flight and escape a police dog and police officers searching for him, both in vehicles and on foot, was close to zero. Under these circumstances, it strikes this court that, at an absolute minimum, a reasonable police officer would have announced the presence of his police dog and given the suspect an opportunity to decide if he wished to try to outrun her. In the unlikely event that the suspect decided to do so, the use of the police dog to apprehend the fleeing suspect would arguably be reasonable, assuming that the dog did not use an undue amount of force in doing so.

As it happens, Horn Lake policies require precisely the sort of announcement referenced above, and, in his deposition, Brown conceded both the existence of such a policy and the fact that he failed to follow it:

Q: But you didn't give him any announcement?
A: No. I did not give him any verbal warning.
Q: Again, try to let me finish my -

A: Okay.
Q: You did not give him any verbal announcement, which is required under Horn
Lake's policy, to give him the opportunity to submit without being bitten?
A: Correct. [Dep. at 89].

Thus, Brown conceded in his deposition that he did not give plaintiff the verbal warning that was

required under the city's policies prior to the start of the dog attack. The difference in the

parties' version of events relates to whether or not Brown first ordered the dog to attack, as

plaintiff testified, or whether, as Brown contends, the dog initiated an attack which the officer

allowed to continue.

In their briefing, defendants place great emphasis upon their contention that Sunny first

bit plaintiff without orders to do so, apparently believing that this contention helps their case.

This court does not believe that it does. Under Brown's version of events, he was confronted

with an attack by his dog upon a suspect which was both unauthorized and contrary to city

policy. And yet he allowed that attack to continue for a lengthy period of time, resulting in

serious injuries to plaintiff. What could be more unreasonable than that? Of course, *Tolan*

instructs that this court must credit plaintiff's version of events in this context, and it is therefore,

arguably improper to consider Brown's version of events at all. Moreover, Brown's own expert,

Wendell Nope, testified that if plaintiff's version of events is credited (as *Tolan* requires), then "I

would consider that as excessive force." [Nope Dep. at 72-73]. Given that plaintiff must

demonstrate that Brown's actions were "obviously" unreasonable, however, the court considers it

relevant to note that such a showing of unreasonableness can be made under either side's version

of the material facts of this case.

In his deposition, Brown maintained that plaintiff did not sufficiently convey his

"surrender" once Sunny began attacking him. Once again, however, plaintiff had a right under city policy to decide whether to surrender *before* being attacked, and it was clearly unreasonable for Officer Brown not to give him that opportunity to the extent possible, including by terminating Sunny's attack as soon as it began (under his version of events). Indeed, Brown acknowledged in his deposition that it might prove difficult for a suspect to convey his surrender while preoccupied with fending off a severe dog attack:

> Q: So in your report where you put "refused to comply with commands" or something, whatever the specific, you check a yes next to that?
> A: Yes. That's when I was trying to get him to come out to me or show me his hands.
> Q: Okay.
> A: That was for me.
> Q: All right. And I think we agreed earlier, that would have been difficult for him to do with a dog on him?
> A: It's not that it's difficult for them to do, but I would have an understanding on why they wouldn't. But I've caught several people within my career, I've had people walk up to me carrying the dog on them. I've had guys quickly show me their hands wanting the dog to come off of them, and he failed to do that.

[Dep. at 53-54].

Nevertheless, Brown conceded that plaintiff did comply with most of his instructions, including his order to roll over on his stomach:

> Q: Do you remember the position that he was laying in?
> A: I ordered him onto his stomach.
> Q: Okay. And he complied?
> A: Yes, he did. . . .
> Q: Okay. And what did Sunny do when he was rolling?
> A: She continued to hold onto his leg.
> Q: Okay. How does he roll when a dog has a hold of his leg?
> A: I can't explain that. He was on his butt. When I told him to roll over, he rolled over and laid down on his stomach and I was able to . . .
> Q: Besides your orders for him to show his hands or submit to you after Sunny had engaged, there were no orders which Mr. Cooper had not complied with of yours?
> A: Correct. [Dep. at 53].

Thus, Brown made it clear that the only order of his with which plaintiff did not comply were his instructions to show his hands. Brown also made it clear, however, that the hands which he wanted to see raised were otherwise occupied at the time, namely in trying to stop Sunny from continuing to maul his leg:

Q: Okay. What did you see?
A: His hands on her head.
Q: Okay. Was he hitting her?
A: No.
Q: Okay. He was just holding his hands on her head?
A: Right.
Q: Okay. So you were able to see his hands. So you could appreciate at that point, at least as far as you could tell, he had no weapon?
A: At that point, yes.

[Dep. at 82].

In judging the reasonableness of Brown's actions, it strikes this court as quite significant that he was able to perceive early in Sunny's attack that there was no weapon in plaintiff's hands. Indeed, the ostensible purpose of having plaintiff show his hands was to demonstrate that he was unarmed, but Brown testified that he could ascertain that such was the case by watching plaintiff try to protect himself from Sunny's attack. That being the case, it is very much unclear to this court why it was either necessary or reasonable for Officer Brown to allow Sunny's attack to continue against an unarmed, non-violent suspect who had not been given the verbal warning which Brown conceded was required under Horn Lake's policies.

Once again, Brown conceded that plaintiff complied with his instructions to roll on his stomach, and it is undisputed that he did eventually manage to pull his hands off Sunny's head and place them behind his back so that he could be handcuffed. The court finds it highly significant that defendant's own expert Nope conceded that it was unnecessary to allow a dog to

remain on the bite past that point:

> Q: Okay. So Sunny could have been called back once Mr. Cooper had submitted
> to a backup position instead of being left on throughout the entire cuffing process?
> A: Yes, sir.
> Q: Okay. And that very well could have resulted in less injury to Mr. Cooper?
> A: Yes, sir.
> Q: Once Mr. Cooper rolled to his stomach and put his hands where Officer Brown
> told him to put his hands, was there any reason to leave the dog on at that point?
> A: I cannot think of any reason to allow the dog to remain physically engaged
> after that point.
> Q: In fact, officers cuff suspects in this manner routinely, correct?
> A: Yes, sir.
> Q: Without the use of a dog?
> A: Yes, sir.
> Q: And, in fact, most arrests occur without the use of a dog, correct?
> A: Yes, sir, overwhelmingly.
> Q: Okay. Is there any evidence you can show the jury in this case to account why
> Officer Brown could not order his dog to a backup position once Mr. Cooper was
> on his stomach instead of leaving the dog on?
> A: No, sir.

[Nope Dep. at 57-58].

In the court's view, it is a testament to the obvious nature of the constitutional violations in this case that some of plaintiff's strongest evidence comes from concessions made by defendant's own expert, who is to be commended for his honesty. This court believes that Nope's testimony makes it clear that, without question, Officer Brown's actions became "obviously unreasonable" when he continued allowing Sunny to bite plaintiff after he was on his stomach and his hands were behind his back. This court believes that Brown's actions were obviously unreasonable even before then, but the issue seems to be simply indisputable at that point. As discussed below, plaintiff testified that Brown seemed to take an inordinately long time to handcuff him after he was on his stomach and his hands were behind his back, and it seems clear that much of his injuries occurred after this point.

Expert testimony aside, there is, in this court's view, a macabre quality to the feats of willpower which Officer Brown appears to regard it as necessary for suspects to perform in order to obtain his mercy. Whether those feats involve a suspect dragging an attacking police dog with him (presumably as part of a gesture of surrender), or, in this case, plaintiff managing to remove his hands from the head of an attacking dog, Officer Brown's testimony strikes this court as being that of an officer who unreasonably fails to realize that his dog's attacks makes it much more difficult for a suspect to give the clear gestures of surrender he claims to be looking for. In the court's view, a reasonable police officer should know that a suspect being attacked by a police dog will tend to be distracted by this fact and may not be able to either understand or fully follow instructions regarding the manner of surrender. In this vein, the district court in *Malone* aptly wrote that "[t]he court wonders how a man, who is prone on the ground and being attacked by a dog, can reasonably be expected to expose his hands and unflinchingly hold them behind his back." *Malone*, 2014 WL 5781001, *10, n. 5.

The court notes that Officer Brown's own testimony did not depict plaintiff's ordeal as a brief one. When asked about the length of time which Sunny was left "on this bite," Officer Brown testified as follows:

Q: About thirty seconds?
A: It was longer than thirty seconds, but it was no longer than a minute or two due to the aspect I had to drag him out and then get him cuffed up. But once he was in handcuffs, once those handcuffs clicked, it was a matter of seconds before she was off the bite. [Dep. at 62].

A period of a "minute or two" strikes this court as being an exceedingly long period of time for an officer to allow a dog to continue attacking a non-violent, defenseless suspect who had not been given the verbal warning to which he was entitled under city policy. In the qualified

immunity context, courts are frequently reminded not to second-guess police officers based on "split second" decisions they are required to make in the course of doing their jobs. While this court fully agrees with this admonition, it appears that, in this case, Officer Brown had ample time to consider the suffering and injuries that he was inflicting upon plaintiff and whether there was any law enforcement justification for so doing.

Based on his own testimony, Officer Brown does not strike this court as an officer reluctantly resorting to force, but, rather, one only reluctantly *terminating* the use of force. Plaintiff's testimony, which this court is required to credit at the summary judgment stage, places Brown in a much worse light. In describing the attack on him, plaintiff testified as follows:

> Q: Okay. And when he, the officer, got on your back, tell me again exactly what happened there.
> A: The dog was biting me on my leg, and I was trying to lay as still as possible screaming bloody murder to please get the dog. And I could hear him snorting blood. He didn't just bite me, he grabbed a hold of me and he was eating me is what it felt like. He was literally eating my flesh. . . . The dog, it was behaving like it was starving. It was like something out of a horror movie where an animal is eating road kill. And it was -
> Q: So you're saying -
> A: - Devouring me. [Dep. at 58].

Plaintiff's testimony on the duration of the attack was quite similar to Officer Brown's, stating that it "felt like forever" but that it was realistically "over a minute at least." [Dep. at 88].

As noted previously, one area where plaintiff's testimony differs from Officer Brown's relates to whether Sunny first attacked him on her own initiative or whether Brown ordered her to do so. According to plaintiff's testimony, the latter is the case. In his deposition, plaintiff described the initiation of the attack on him as follows:

> A: . . . So I sat down beside the house. And Officer Brown and the dog - the dog passed me and Officer Brown seen me out of the corner of his eye, pulled the dog back and said "bite." And he had the dog back and said "bite him." [Dep. at 44].

Plaintiff testified that it seemed to take an unduly long time for Brown to handcuff him and, thus, for the dog attack to end. When asked why he felt that was the case, plaintiff testified as follows:

Q: Do you know why it took that amount of time?
A: No idea. Improper training on how to handcuff, I guess.
Q: Okay. Did you have any trouble getting your arms around?
A: No, sir. [Dep. at 88].

Plaintiff testified that, once the dog attack had ended, he asked Officer Brown about the reasons for the attack:

A: . . . And he finally got the cuffs on me and got off of me. And I remember I asked him, you know, why he let the dog eat me up like that. And he told me that he didn't have to get the dog off until he got the cuffs on. [Dep. at 44].

Brown's alleged explanation (contradicted by his own expert) that "he didn't have to get the dog off until he got the cuffs on" seems quite consistent with his deposition testimony, which appears to depict an officer in no great hurry to terminate the attack by his dog.

This court's impressions regarding Officer Brown's seeming eagerness to employ his police dog is buttressed by the testimony of one of his former co-workers. Specifically, former Horn Lake K9 officer Todd Baggett testified that:

Well, just some – some of the other – the stuff that we didn't use the dog for [Brown] would. You know, that's why he would have 90 deployments to our 30. You know, it's just something we weren't going to use a dog for. You know, and I've always, even when I had a dog, I relied on what I do and not what the dog does. So I could go out and do the same thing with or without the dog, you know, aside from biting and stuff.

[Plaintiff's exhibit "K," p.32.] This court is not in a position to judge Officer Brown's character, and it cannot say whether he is simply an overzealous police officer primarily concerned with bringing suspects to justice, or whether there might have been a darker, more sadistic, motivation behind his actions. The jury may inquire into this issue when it decides the issue of punitive

damages against him.  *See Smith v. Wade,* 461 U.S. 30, 31 (1983)(holding that "a jury may be permitted to assess punitive damages in a § 1983 action when the defendant's conduct involves reckless or callous indifference to the plaintiff's federally protected rights, as well as when it is motivated by evil motive or intent.").

At this juncture, this court must simply decide whether, under *Hope*, Officer Brown's actions were "obviously" contrary to the Fourth Amendment.  For the reasons explained above, this court concludes that they were.  This court acknowledges that, in relying upon *Hope*, it is invoking an exception which is not frequently applied.  This court notes that while plaintiff did not expressly cite *Hope* in his briefing, he did cite the *Stranjac* decision which, as noted previously, clearly utilizes *Hope*'s rationale.  At any rate, *Hope* constitutes an established part of the U.S. Supreme Court's qualified immunity jurisprudence, upon which this court is entitled to rely.  Indeed, this court believes, as previously stated, that *Hope* is not merely an established, but also a very important part of the Supreme Court's qualified immunity jurisprudence.  Once again, without such an exception, officers might be permitted to act with impunity in cases involving fact patterns which have not been sufficiently addressed by federal appellate authority, and federal jurisprudence might be left frozen in place.

This court has invoked the *Hope* exception because it believes that granting Brown summary judgment based on plaintiff's failure to produce sufficient federal appellate court authority would work a clear miscarriage of justice in this case.[1]  This court has previously

---

[1]The court notes that even Brown appears to concede that summary judgment in his favor might be deemed inappropriate, writing in his brief that "[t]he question of submissiveness is necessarily linked to duration of the apprehension, and under the scenario presented by plaintiff should either be ruled favorably for Officer Brown as a matter of law, or if not, is one for the jury." [Brief at 2].

delineated numerous facts specific to this case which render Brown's actions more unreasonable than simply employing his dog against a suspect, and the extreme nature of these facts distinguish this case from more typical cases involving dog "holds" upon suspects. Indeed, this court believes that cases involving fact patterns as egregious as this one generally settle before they even get to the federal appellate stage. Moreover, the very purpose of requiring a plaintiff to produce authority clearly establishing the illegality of the defendant's actions is to establish that the defendant had "fair notice" that his actions were contrary to law. *See Plumhoff* , 134 S. Ct. at 2023, *citing Brosseau*, 543 U.S. at 200. While it may be rather fictional to assume that police officers read federal appellate decisions at all, that is the rationale behind the requirement. The *Hope* exception properly recognizes that such a showing is unnecessary in cases where it should have been "obvious" to a reasonable officer that his actions were unlawful.

In this case, it should, in fact, have been obvious to any reasonable officer in Brown's position that his actions were objectively unreasonable and thus unlawful under the Fourth Amendment, for the reasons previously stated in this order. The court therefore concludes that the defense of qualified immunity is unavailable to Brown in this case, notwithstanding plaintiff's failure to produce a "robust consensus" of federal appellate authority in support of his claim. Brown's motion for summary judgment will therefore be denied.

That does not resolve this court's inquiry, since plaintiff has filed his own motion for partial summary judgment against Officer Brown, solely on the issue of liability. In that motion, plaintiff seeks a ruling from this court that Brown's actions in this case were objectively unreasonable and that plaintiff is entitled to judgment as a matter of law. The U.S. Supreme Court recently recognized that "objective unreasonableness is a question of law that can be

resolved on summary judgment," *see Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015), although this clearly does not mean that federal judges are *required* to resolve Fourth Amendment excessive force cases on summary judgment. Indeed, in many cases, there will be disputed fact issues appropriate for resolution by a jury, and this court does not read *Mullenix* as a broad mandate requiring district judges to make a heads-or-tails evaluation of Fourth Amendment cases on summary judgment. In certain cases, however, the facts will either be undisputed, or the defendant's actions will appropriately be regarded as either reasonable or unreasonable under either party's version of the facts. In such cases, summary judgment on the issue of objective reasonableness may well be appropriate, or even required.

This court's natural inclination is to allow juries to decide issues such as this, and it would frankly prefer to do so in this case. Nevertheless, considering *Mullenix*'s admonition that objective reasonableness is an issue of law for this court to resolve, it can discern no reason not to grant plaintiff's motion for partial summary judgment as to the issue of Brown's liability. Indeed, this court has already concluded, in rejecting Brown's motion for qualified immunity, that his actions were not only unreasonable, but "obviously" unreasonable within the meaning of *Hope*. That being the case, this court can find no justification not to grant plaintiff's motion for summary judgment on the basis of Brown's actions being merely "unreasonable." Indeed, reserving these issues for ruling at trial might only give Brown an incentive to try to recant his own deposition testimony, but this court finds that testimony to be clear enough. Plaintiff's motion for summary judgment against Brown will therefore be granted, and the jury will be asked to decide only the issue of damages (including punitive damages) against him.

That brings this court to the motion for summary judgment filed by Brown's employer,

the City of Horn Lake.  As discussed previously, Brown testified that his actions were contrary to city policy regarding the use of police dogs, and plaintiff concedes that the City has enacted a number of commendable policies in this context.  In arguing that the City should nevertheless be held liable, plaintiff maintains that it is not following the policies which it adopted:

> While Horn Lake has adopted a written policy for the use of canines, it is clear that the policy is not being enforced. For example, the policy requires that a canine unit be requested by the "initial responding unit" or the "on-scene supervisor" after it has been determined that the crime is significant enough to warrant the deployment of a canine unit.  Exhibit "H," p. 5. This policy makes perfect sense. The initial responding unit will have the most knowledge of the situation, or in the alternative, a commanding officer will make the call. However, it is clear that this policy is knowingly not being enforced. Defendant Brown chose to deploy his dog against a misdemeanor DUI suspect on his own with no input from Officer Pressgrove or any commanding officer. Contrary to the written policy, Sgt. Lance Weems testified that it is the practice of Horn Lake to allow its canine handlers to make their own calls on whether to deploy their canines. Exhibit "J," pp. 21-22.

[Plaintiff's brief at 18].

In the court's view, plaintiff's proof and arguments fall short of that required to establish municipal liability in this context.  In so concluding, the court first notes that the Fourth Amendment violation which it finds to have occurred in this case relates to Officer Brown's specific decisions regarding the use of force in this case.  Plaintiff cites generalized city policies regarding the authority to employ K9 units, and it may well be the case that some approaches in this context are better than others.  It does not necessarily follow, however, that a municipality's failure to follow its own procedures regarding the authority to deploy K9 units constitutes a Fourth Amendment violation.

It should also be clear that a city's failure to adequately enforce existing policy does not establish that it has adopted a policy or custom in favor of the exact opposite of that policy.  It is,

in the court's view, much more likely to indicate that the city may intend that its policy be followed but that it has failed to be sufficiently diligent in ensuring that such is the case. Clearly, allegations that a city adopted beneficial policies but has failed to follow them sound in simple *negligence*, not the sort of "deliberate indifference" which the Supreme Court has required to be shown in cases where municipalities are sought to be held liable for the acts of their employees based upon allegations of inadequate training, supervision or hiring. *See City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197 (1989); *Board of Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 117 S. Ct. 1382 (1997).[2]

In the court's view, the City of Horn Lake should not take undue comfort in its conclusion that it may have "only" been negligent in ensuring that the policies it has adopted are followed. Officer Brown is the City's employee, and it is now clearly on notice of this court's findings regarding his use of excessive force in this case. The City may also consider the testimony of its former K9 officer Baggett that Officer Brown was much more willing to employ police dogs against suspects than other officers. What is merely negligent in this case may be deliberately indifferent in the next, and the court trusts that the City will consider the proof developed in this case in deciding how its citizens should best be protected from the unjustified use of force. The fact that the City has adopted beneficial policies in this context suggests that its heart may be in the right place on this issue, but good intentions and good policies are

---

[2]This court notes parenthetically that the Mississippi Attorney General has issued an opinion that municipalities in this state have a duty to "defend and indemnify" their employees "in federal law actions for acts or omissions occurring within the course and scope of their duties." *See Mr. Greg Hardy*, 1995 WL 108943 (1995). This is consistent with this court's experience regarding the practical effect of federal court judgments against municipal employees in this state. Thus, while this issue does not impact this court's analysis in this case, it is noteworthy that the legal distinction between Officer Brown and the City of Horn Lake is not as great as it may at first appear.

insufficient if they are not enforced.  With that caveat, the City's motion for summary judgment will be granted.

In light of the foregoing, it is ordered that plaintiff's motion for partial summary judgment against Officer Brown is granted, Officer Brown's motion for summary judgment on the basis of qualified immunity is denied, and the City of Horn Lake's motion for summary judgment is granted.

So ordered, this the 12th day of January, 2016.


/s/ Michael P. Mills
U.S. DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI